Benjamin SMALL, Appellant
(Defendant),

v.

The STATE of Wyoming, Appellee
(Plaintiff).

No. 84–26.

Supreme Court of Wyoming.

Oct. 2, 1984.

Rehearing Denied Oct. 30, 1984.

Leonard D. Munker, State Public Defender, Wyoming Public Defender Program; and Sylvia Lee Hackl, Appellate Counsel, Wyoming Public Defender Program, Cheyenne, for appellant.

A.G. McClintock, Atty. Gen., Gerald A. Stack, Deputy Atty. Gen., John W. Renneisen, Senior Asst. Atty. Gen., Michael A. Blonigen, Asst. Atty. Gen., Cheyenne, for appellee.

Before ROONEY, C.J., and THOMAS, ROSE, BROWN and CARDINE, JJ.

BROWN, Justice.

Appellant was convicted by a jury of involuntary manslaughter. Because his status was also determined by the jury to be that of an habitual criminal, his sentence was enhanced to life imprisonment.

According to appellant the issues are:
"I. Whether Appellant's constitutional right to due process of law was abridged by the trial court's refusal to instruct the jury regarding the burden of proof on the issue of self-defense.

"II. Whether the trial court erred in its instructions to the jury regarding the law on the issue of duty to retreat.

"III. Whether the enhanced penalty provisions of the habitual criminal statute violate constitutional guarantees of equal protection of the law when invoked against an accused charged with involuntary manslaughter.

"IV. Wyoming Statute § 6–10–201 (1983 Cum.Supp.) et seq. violates procedural due process at sentencing."

We will affirm.

Appellant Benjamin Small and his nephew William Hairston, after leaving a Cheyenne bar, became stuck in the mud along Crow Creek. Eddie Vigil, while driving by, stopped to give aid. The combined efforts of Small, Hairston and Vigil to extricate Hairston's car from the mud were unsuccessful. The three of them left the Hairston car and started in Vigil's car to the residence of Hairston's brother, Jerome Hairston.

During the attempt to free Hairston's car from the mud and during the ride in Vigil's car, Small and Vigil exchanged racial slurs. Vigil stopped his vehicle near the 3000 block of Thomes in Cheyenne, having driven past Jerome Hairston's house. After stopping, Vigil and Hairston fought. Vigil was badly beaten. After Hairston left the scene of the conflict Vigil got up on his hands and knees and attempted to blow blood out of his nose and mouth. At this point appellant approached Vigil, and a fight between appellant and Vigil erupted. Appellant got on top of Vigil, and he kicked him on the face and head. The combatants briefly disengaged, but appellant remained, and talked and quarreled with Vigil. The affray resumed and appellant threw Vigil to the ground. Vigil hit his head on the pavement and did not move after that. Appellant then placed Vigil into the latter's vehicle and parked it around the corner.

Eddie Vigil died as a result of massive head trauma induced by a blunt object. He was a young chicano male about five foot two inches, weighing 130 pounds. Hairston and Small are black, the latter, six feet two inches tall. It was obvious to both Hairston and Small that Vigil was very drunk.

On December 14, 1983, appellant was convicted of involuntary manslaughter in violation of § 6-2-105(a)(ii)(B), W.S.1977. Appellant was also found to be an habitual criminal and because of this status he was sentenced to life imprisonment according to § 6-10-201, W.S.1977 (June 1983 Replacement).

## I

Appellant assigns as error the court's refusal to specifically instruct the jury that the state must prove beyond a reasonable doubt that the defendant (appellant) did not act in self-defense. We recently addressed this problem in *Scheikofsky v. State,* Wyo., 636 P.2d 1107, 1112 (1981):

"The inclusion of a specific statement of the burden of proof would have been preferable, but failure to include it is not reversible error per se. The test should be whether the instructions, taken as a whole, adequately informed the jury that the prosecution's burden of proof beyond a reasonable doubt included negating appellant's assertion of self-defense. * * * "

Under the facts as related by appellant it is very difficult to view this as a self-defense case. Appellant said, "I was scared." However, there was nothing of substance in the testimony indicating that self-defense was involved. Out of an abundance of caution the trial judge gave eight instructions on self-defense.

■ The trial court also instructed the jury that one of the necessary elements of involuntary manslaughter was that "the defendant acted recklessly." In another instruction the court defined "recklessly." The state proved to the satisfaction of the jury that appellant acted recklessly. The same evidence that proved appellant acted recklessly also proved that appellant did not act in self-defense since proof of recklessness under the facts of this case negates self-defense. A finding of recklessness is inconsistent with, and precludes a finding of, self-defense.

"* * * When recklessness is an element of the crime charged, and the court properly instructs the jury on the elements of recklessness, the jury must determine, before it may convict, that the accused knew of and disregarded a substantial risk that a wrongful act would occur and that such disregard was a gross deviation from the conduct of a reasonable person in the same situation. Such a finding is totally inconsistent with self-defense. A person acting in self-defense cannot be acting recklessly. Thus, if the jury is able to find that a defendant acted recklessly, it has already precluded a finding of self-defense. * * * " *State v. Hanton,* 94 Wash.2d 129, 614 P.2d 1280, 1282 (1980).

■ We hold that the instructions, taken as a whole, adequately informed the jury of the state's burden of proof, including the

negation of appellant's assertion of self-defense.

In the State of Washington appellate courts have long held that the trial court was not necessarily required to instruct the jury that a burden to prove absence of self-defense rested on the prosecution. *State v. Hanton,* supra. The rationale of the Washington cases was similar to the reasoning we employed in *Scheikofsky v. State,* supra. That is a totality of the instructions test. Recently, however, in *State v. McCullum,* 98 Wash.2d 484, 656 P.2d 1064, 1073–1074 (1983), in a plurality decision, the Washington Supreme Court modified their previous decision by stating:

"* * * While we continue to believe specific burden of proof instructions technically are not necessary, it may be preferable to do so for the sake of clarity. Simply setting forth the elements of the crime without explanation of how self-defense relates to those elements may, itself, cause a jury some confusion as to where the burden of proof lies. Without a clear instruction on the subject, the potential for misinterpretation is simply too great.

"We think the best policy regarding such specific jury instructions is summarized in *Notaro v. United States,* 363 F.2d 169, 175 (9th Cir.1966):

"'The desire of a careful judge to avoid language which to him may seem unnecessarily repetitive should yield to the paramount requirement that the jury in a criminal case be guided by instructions framed in language which is unmistakably clear. * * *'

"* * * [W]e feel this is the better approach to handling burden of proof issues regarding self-defense, at least when a specific instruction is requested by the defendant. A specific instruction on the burden of proof as to self-defense should serve three desirable ends: (1) clarify burden of proof questions and reduce the chances for jury confusion; (2) make appellate review of such issues easier, especially as to sufficiency of the evidence challenges; and (3) reduce the

likelihood that future convictions would have to be reversed for errors similar to the one presented here." See also *United States v. Corrigan,* 548 F.2d 879 (10th Cir.1977).

 We agree with the *McCullum, Notaro* and *Corrigan* cases; henceforth, when self-defense is properly raised the jury should be specifically instructed that the state has the burden to prove absence of self-defense beyond a reasonable doubt. Such an instruction would eliminate any possible confusion for a jury. However, in this case, as in *McCullum,* failure to specifically instruct that the state has the burden to prove absence of self-defense beyond a reasonable doubt is not reversible error.

## II

The trial court gave the following instruction:

"Even if the defendant has reasonable ground to believe and actually did believe that he was in imminent danger of death or serious bodily harm, he was justified in using deadly force to repel the danger only if he retreated as far as he safely could before doing so. The law requires a person to retreat rather than to take the life of his adversary if there was a convenient mode of retreat without increasing his peril or apparent peril. To excuse a failure to retreat, it is necessary the defendant's peril would be increased, or that it reasonably appeared that it would be increased by retreat. If you find that the defendant could have safely retreated but failed to do so, the defendant cannot rely on the justification of self-defense."

The instruction on self-defense given by the court was taken from the Wyoming Pattern Jury Instructions Criminal, No. 5.207. This identical instruction was given and approved by this court in *Garcia v. State,* Wyo., 667 P.2d 1148 (1983). Appellant objected to this instruction and offered the following substitute instruction, which the court refused.

"You are instructed that a person who provokes or brings about an incident in which he kills his assailant cannot invoke the right of self-defense, unless he, in good faith, retreats as far as he safely can, and making that fact manifest to his adversary.

"However, an individual who is without fault in bringing about the incident in which he kills his assailant need not restrict his freedom of movement to be where he has a right to be, and he need not retreat.

"Prior to resorting to deadly force a defendant, if he is the instigator of a fight, has a duty to pursue reasonable alternatives under the circumstances, one of which may be the duty to retreat.

"If you find that Benjamin Small was the instigator of a fight with Eddie Vigil, then Benjamin Small had a duty to retreat as he safely could before using deadly force in self-defense.

"On the other hand, if you find that Benjamin Small was not the instigator of a fight with Eddie Vigil, Benjamin Small had no duty to retreat before resorting to deadly force in self-defense provided that the other elements of the right of self-defense existed at the time as stated in previous instructions."

Appellant relies on a statement made in *Garcia v. State,* supra, as authority for his proposed instruction: In *Garcia* we said, at p. 1153:

"* * * In general, it can be concluded from these prior discussions that an individual who is without fault in bringing about the incident in which he kills his assailant need not restrict his freedom of movement to go where he has a right to be. * * * [T]he law in the State of Wyoming requires that prior to resorting to deadly force a defendant has a duty to pursue reasonable alternatives under the circumstances. Among those reasonable alternatives may be the duty to retreat. * * *"

■ We are not convinced that appellant's proposed instruction is an accurate and complete statement of the law; how-ever, we need not make that determination here. We hold that such instruction was not appropriate under the undisputed testimony produced at trial. There was no evidence indicating that Vigil instigated a conflict with appellant. In fact, fault, with respect to the fight, points to appellant.

We have loosely characterized the encounter between the deceased and appellant as a fight or affray, and the parties as combatants; however, appellant was doing all the hitting and kicking and Vigil was on the receiving end. Appellant could have walked away from the encounter before, during, or at any time, but remained near Vigil without any apparent reason except to hit and kick him. Vigil did nothing to hurt appellant, endanger his life or threaten any kind of injury. Appellant makes a feeble assertion that Vigil kept grabbing his leg. This may be true, but Vigil was down and badly beaten, and appellant was the aggressor. In other words, Vigil did not come after appellant. The court properly instructed the jury on the duty to retreat and on self-defense. The circumstances of this case did not justify the instruction requested by appellant.

### III

Appellant contends that the enhanced penalty provisions of the habitual criminal statute violate constitutional guarantees of equal protection of the law when invoked against an accused charged with involuntary manslaughter. The Fourteenth Amendment to the United States Constitution provides, in pertinent part: "No State shall * * * deny to any person within its jurisdiction the equal protection of the laws."

In Wyoming a person convicted of a fourth felony is subject to an enhanced sentence of life imprisonment if the current felony conviction is for a violent felony. § 6–10–201(a)(i), W.S.1977 (June 1983 Replacement). A violent felony is defined as "murder, manslaughter, kidnapping, sexual assault in the first or second degree, robbery, aggravated assault, aircraft hijacking, arson in the first or second degree or

aggravated burglary." § 6-1-104(a)(xii), W.S.1977 (June 1983 Replacement).

Appellant was convicted of involuntary manslaughter defined in § 6-2-105 (a)(ii)(B), W.S.1977 (June 1983 Replacement).

"(a) A person is guilty of manslaughter if he unlawfully kills any human being without malice, expressed or implied, either:

\* \* \* \* \* \*

"(ii) Involuntarily, but:

"(A) In the commission of some unlawful act except as provided in W.S. 6-2-106 [aggravated homicide by vehicle]; or

"(B) Recklessly."

The aggravated vehicular homicide statute defined in § 6-2-106(b), W.S.1977 (Cum.Supp.1984), provides:

"(b) A person is guilty of aggravated homicide by vehicle and shall be punished by imprisonment in the penitentiary for not more than twenty (20) years if, while driving a motor vehicle in violation of W.S. 31-5-233, he unlawfully causes the death of another person and the violation is the proximate cause of the death."

Section 31-5-233, W.S.1977, prohibits operation of a motor vehicle while under the influence of alcohol or a controlled substance to a degree that the driver can no longer safely operate a motor vehicle.

Appellant reasons that it violates equal protection to subject a person to the habitual criminal act when a conviction of involuntary manslaughter results in a fourth felony conviction while conviction for aggravated vehicular homicide does not subject an individual to the habitual act, regardless of the number of previous felony convictions. He argues that the two statutes proscribe identical conduct, but subject violators to different penalties. Appellant argues further that there is not a rational basis for distinguishing between involuntary manslaughter and aggravated vehicular homicide, making conviction of the former subject to an enhanced penalty but not the latter.

We do not disagree with appellant that wherever two or more statutes provide different punishment for exactly the same criminal conduct, equal protection is violated. *People v. Hulse,* 192 Colo. 302, 557 P.2d 1205 (1976). Appellant does not contend that the two statutes are exactly the same and have identical elements, but asserts that they are intrinsically the same and proscribe similar conduct.

Appellant's equal protection argument that the involuntary manslaughter and aggravated vehicular homicide statutes govern the same conduct must fail because the involuntary manslaughter and the vehicular homicide statutes do not govern identical or even substantially similar conduct. Generally, if crimes defined in two separate statutes involve different elements, different criminal conduct is involved. *Bell v. State,* Alaska, 598 P.2d 908 (1979).

The aggravated vehicular homicide statute requires that death occur as a result of operation of a motor vehicle and that the driver be intoxicated. Neither of these two elements are required in the involuntary manslaughter statute. Both statutes proscribe an unintentional killing, but this is not sufficient identity of the elements to support the argument that the two statutes proscribe identical conduct.

Our determination that the involuntary manslaughter statute and aggravated vehicular statute govern substantially different conduct does not completely answer the equal protection issue. We must also address whether or not offenses included in the habitual criminal statute unconstitutionally distinguish between persons similarly situated in an arbitrary and unreasonable manner.

In *State v. Freitas,* 61 Hawaii 262, 602 P.2d 914, 922 (1979), the court said:

"The Equal Protection Clause mandates that all persons similarly situated shall be treated alike, both in the privileges conferred and in the liabilities imposed.

[Citation.] It does not, however, require that state legislation operate or apply equally upon every citizen of a state. *Stebbins v. Riley*, 268 U.S. 137, 45 S.Ct. 424, 69 L.Ed. 884 (1925). A legislative classification which is reasonable and not arbitrary, and which is based upon some ground of difference bearing a rational relation to the objectives sought to be achieved by the legislation is permissible. *Royster Guano Co. v. Virginia*, 253 U.S. 412, 40 S.Ct. 560, 64 L.Ed. 989 (1920). Thus, discrimination between classes is not per se objectionable, so long as any state of facts reasonably can be conceived to sustain it. *Allied Stores of Ohio v. Bowers*, 358 U.S. 522, 79 S.Ct. 437, 3 L.Ed.2d 480 (1959). Accordingly, it has been said that '[t]he equal protection clause of the Fourteenth Amendment does not take from the State the power to classify in the adoption of police laws, but admits of the exercise of a wide scope of discretion in that regard, and avoids what is done only when it is without any reasonable basis and therefore is purely arbitrary.' *Lindsley v. Natural Carbonic Gas Co.*, 220 U.S. 61, 78, 31 S.Ct. 337, 340, 55 L.Ed. 369 (1911). And because a statute is presumed to be constitutional, *State v. Baker*, 56 Haw. 271, 535 P.2d 1394 (1975), the party challenging the constitutionality of a statute on equal protection grounds bears the heavy burden of showing that the statute is arbitrary and capricious, and as such, objectionable. [Citation.]"

It was further said in *Williamson v. Lee Optical Company of Oklahoma*, 348 U.S. 483, 489, 75 S.Ct. 461, 465, 99 L.Ed. 563, 573 (1955):

"The problem of legislative classification is a perennial one, admitting of no doctrinaire definition. Evils in the same field may be of different dimensions and proportions, requiring different remedies. Or so the legislature may think. *Tigner v. Texas*, 310 U.S. 141, 60 S.Ct. 879, 84 L.Ed. 1124, 130 A.L.R. 1321. Or the reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the

legislative mind. *Semler v. Oregon State Dental Examiners*, 294 U.S. 608, 55 S.Ct. 570, 79 L.Ed. 1086. The legislature may select one phase of one field and apply a remedy there, neglecting the others. *A.F. of L. v. American Sash & Door Co.*, 335 U.S. 538, 69 S.Ct. 258, 93 L.Ed. 222. The prohibition of the Equal Protection Clause goes no further than the invidious discrimination."

██ In determining whether a classification has a reasonable basis, any facts that would reasonably support the classification must be assumed to have existed at the time the legislation was passed. *Galesburg Construction Company, Inc. v. Board of Trustees of Memorial Hospital of Converse County*, Wyo., 641 P.2d 745 (1982).

██ A statute does not violate the equal protection clause merely because it could have included other persons, objects or conduct. *State v. Freitas*, supra.

"'* * * [O]ne who attacks the constitutionality of a statute assumes the burden of establishing his contention clearly and beyond a reasonable doubt. [Citations.] In determining such issues we start with a presumption of constitutionality of the legislative enactment, and it is our rule of jurisprudence that we should resolve any reasonable doubts as to constitutionality by upholding the statute if possible. [Citations.] * * * With respect to his standing to raise such an issue the rule is that, with the limited exception of challenges to statutes that broadly prohibit speech protected by the First Amendment, a party must demonstrate the manner in which his own rights are adversely affected in light of the circumstances before the court in order to present his constitutional challenge. [Citations.] * * *"' *Armijo v. State*, Wyo., 678 P.2d 864, 867–868 (1984).

The purpose of the aggravated vehicular homicide statute is to reduce the carnage on the highways by the drunk driver. *South Dakota v. Neville*, 459 U.S. 553, 103 S.Ct. 916, 78 L.Ed.2d 748 (1983). The invol-

untary manslaughter statute does not attempt to deal with the safety hazards created by the drunk driver. In this case appellant purposely used excessive force, administering a vicious beating to the victim that resulted in his death. The victim of an aggravated vehicular homicide is not purposely encountered by the offender. Ordinarily the victim of involuntary manslaughter is purposely encountered, as in this case.

The drunk driver who causes death is not operating in an intentionally violent manner; he is acting negligently. The unlawful act is not violent in nature. In contrast, appellant here intentionally acted in a violent manner. This is one of the types of conduct which the legislature had in mind when it passed the habitual criminal statute.

 The legislature obviously perceived a difference in the conduct governed by the two statutes because the manslaughter statute specifically excludes aggravated vehicular homicide from its ambit. We do not find the inclusion of involuntary manslaughter in the definition of violent crimes and the exclusion of aggravated vehicular homicide to be an arbitrary and capricious classification. Whether a classification is reasonable or unreasonable must be determined from the classification within a particular statute and the circumstances prompting the classification.

## IV

In Small's final assignment of error he contends that the habitual criminal statute "violates procedural due process at sentencing." The pertinent habitual criminal statutes provide:

Section 6–10–201, W.S.1977:

"(a) A person is an habitual criminal if:

"(i) He is convicted of a violent felony; and

"(ii) He has been convicted of a felony on two (2) or more previous charges separately brought and tried which arose out of separate occurrences in this state or elsewhere.

"(b) An habitual criminal shall be punished by imprisonment for:

"(i) Not less than ten (10) years nor more than fifty (50) years, if he has two (2) previous convictions;

"(ii) Life, if he has three (3) or more previous convictions."

Section 6–10–203, W.S.1977:

"(a) An information or indictment which charges a person as an habitual criminal shall set forth the charged felony and allege the previous convictions.

"(b) The trial on the charged felony shall proceed as in other cases, but the jury shall not be informed of the previous convictions. If the defendant is convicted of the charged felony and does not plead guilty to the charge of the previous convictions, he shall be tried immediately by the same jury or judge on the charge of the previous convictions.

"(c) In a trial under this article, a duly authenticated copy of the record of previous convictions and judgments against the defendant of any court of record are prima facie evidence of the previous convictions and may be used in evidence against the defendant."

After the jury returned its verdict finding appellant guilty of involuntary manslaughter, evidence of appellant's prior convictions was presented. Appellant concedes that the three judgments upon which the habitual criminal status was based were valid judgments and that he was the person named in the judgments. He made numerous objections to the habitual criminal statute and to the procedure that the court followed. The jury found that appellant "has been three times previously convicted of a felony upon charges separately brought and tried." Based on the jury's finding the court sentenced appellant to life imprisonment.

In his attack on the habitual criminal statute and the procedure employed by the court appellant uses a "scatter gun" approach. The complaints are numerous, and in some cases repetitious and overlapping.

Appellant made what he characterizes as an offer of proof to the court before the

jury deliberated on his habitual criminal status. He offered to show cultural deprivation in mitigation. The remainder of the so-called offer of proof was an attack on the statute and court procedure. Appellant also advised the court of the substance of a proposed argument to the jury.

In his brief appellant reiterates the arguments in support of this last issue raised on appeal which he made to the trial court, and seems to ask that this court respond to the following:

"(1) Does [sic] Section 6–10–210(a)(ii) and Section 6–10–203(c) constitute proof of a prima facie case and therefore foreclose the defense from presenting evidence on any other issue;

"(2) Does the prima facie evidence referred to in Section 6–10–210(a)(ii) and Section 6–10–203(c) establish an irrebuttable presumption or can evidence be offered in rebuttal;

"(3) Does [sic] Section 6–10–201(a)(ii) and Section 6–10–203(c) require that the Prosecution establish their case beyond a reasonable doubt or that they only must establish three previous convictions beyond a reasonable doubt;

"(4) Does the trial court have any discretion in allowing Defense Counsel to make an opening statement or has [sic] Section 6–10–201 and Section 6–10–203 revoked both the court's discretion and Defense Counsel's right to state in opening his evidence of non-habitual character;

"(5) Does [sic] the Virginia Statutes and their sentencing process comply with *Boykin v. Alabama*, 395 U.S. 238, 80 S.Ct. 1709, 23 L.Ed.2d 274 (1969) and *McCarthy v. United States*, 394 U.S. 459, 466, 467, 89 S.Ct. 1166 [1170], 22 L.Ed.2d 418 (1969), in taking a defendant's plea and not advising him of the possible habitual criminal statutes where these pleas could be used; and is it proper to use these convictions to enhance the habitual criminal penalties in this State where no such advice to the defendant is given;

"(6) Was the trial judge's interpretation of Section 6–10–201(a)(ii) 'brought and tried' mean a trial or does it include a guilty plea;

"(7) Was the jury correctly instructed under these circumstances;

"(8) Does [sic] Section 6–10–201 and Section 6–10–203 bar Defense Counsel's opening statement as interpreted by the trial court. Does it bar Defense Counsel's closing statement as interpreted by the trial judge and does it serve as a bar generally to the time honored recognition of Defense Counsel's right of allocution;

"(9) Did the trial judge's interpretation of Section 6–10–201 and Section 6–10–203 serve as a bar to any statements of counsel and therefore constitute court imposed ineffective assistance of counsel;

"(10) Can the Legislature establish procedural requirements, rule-making in effect in denying allocution;

"(11) Is [sic] Section 6–10–201 and Section 6–10–203 constitutional or does it [sic] violate equal protection and the Eighth Amendment concepts by failing to establish guidelines that would provide for empirical data necessary to justify the status of habitual criminal behavior. For instance, the Wyoming Death Penalty Statutes does [sic] set out the procedure and the evidentiary method necessary to impose a death sentence."

We addressed substantially the same issues raised by appellant in *Evans v. State*, Wyo., 655 P.2d 1214 (1982). We held that:

1. The habitual criminal statutes do not create an irrebuttable presumption since an accused can attack both the validity of his conviction and his identity as the convicted person.

2. The power to prescribe punishment for acts prohibited belongs to the legislative branch of the government, and there is no violation of the separation of powers doctrine in the removal of sentencing discretion from the trial court.

3. Evidence on mitigation, good moral character and nonhabitual characteristics and conduct are not relevant.

Appellant claims that in the sentencing phase of the trial he was not allowed to

make an opening statement, produce evidence or make a closing argument. This is an inaccurate characterization of the court's ruling. The trial court merely ruled that the matters counsel addressed in his so-called offer of proof were irrelevant and not properly matters to be presented to the jury. Otherwise, appellant was not restricted in an opening statement, production of evidence or closing argument.

Appellant's contention that only convictions by a jury can be used as prior convictions to support an habitual criminal determination is not supported by authority or cogent argument, and is without merit. Equally meritless is the alternative contention that a plea of guilty, if used in future habitual criminal proceedings, must be accompanied by advice that such plea and resultant conviction may be used in the future in habitual criminal determination proceedings.

■ Appellant's basic complaint seems to be that he was precluded from offering evidence of his non-habitual criminal nature, and that he was not allowed to argue mitigation, mercy and compassion. He also characterizes the provision for mandatory life sentence as a denial of due process and of equal protection.

■ There is no provision in the habitual criminal statutes for guidelines that pro-vide for empirical data to justify a determination of habitual criminal status. By contrast, the death penalty statutes set out a procedure, § 6–2–102, W.S.1977 (June 1983 Replacement), whereby circumstances in aggravation and mitigation are presented to the trier of fact. We see no infirmity in the habitual criminal statutes because of the lack of a procedure similar to the death penalty statutes.

Appellant has cited us no authority or reason why proportionality considerations are valid in habitual criminal cases. The sub-issues raised by appellant in this last assignment of error are not supported by authority or cogent argument. We will therefore not address them further. *Elder v. Jones,* Wyo., 608 P.2d 654 (1980); and *Scherling v. Kilgore,* Wyo., 599 P.2d 1352 (1979).

We have carefully considered each assignment of error raised by appellant, and find no reversible error.

Affirmed.