April 3, 1992

IN THE SUPREME COURT OF THE
COMMONWEALTH OF THE NORTHERN MARIANA ISLANDS

| In the Matter of | ) | APPEAL NO. 90-048 |
|---|---|---|
| | ) | CIVIL ACTION NO. 90-846 |
| CATALINA SEMAN, | ) | |
| | ) | OPINION |
| Respondent/Appellant. | ) | |
| | ) | |

Argued and Submitted June 26, 1991

Counsel for Respondent/Appellant: Jane Mack
Micronesian Legal Services
 Corporation
Marianas Office
P.O. Box 826
Saipan, MP 96950

Counsel for Petitioner/Appellee: Thomas Sheldon
Assistant Attorney General
Office of the Attorney
 General
Capitol Hill
Saipan, MP 96950

BEFORE: DELA CRUZ, Chief Justice, VILLAGOMEZ and BORJA, Justices.

VILLAGOMEZ, Justice:

The appellant, Catalina Seman ("Seman"), challenges the constitutionality of 3 CMC § 2513 ("§ 2513") under which she was ordered to be involuntarily committed to the care, custody and

control of the Commonwealth Health Center for not more than 30 days for observation, treatment and medication. We hold that Section 2513[1] violates the due process provision of the NMI Constitution and is declared void.

I.

On September 21, 1990, the government filed a petition to commit Seman to the Commonwealth Health Center psychiatric unit ("CHC psychiatric unit") on Saipan for up to thirty days under § 2513.

---

[1] This statute provides:

(a) The Commonwealth Trial Court may, after hearing, commit for observation of possible mental illness any person within its jurisdiction. The commitment may be made only after testimony presented personally in open court has been received from at least one doctor or medical practitioner authorized to practice medicine in the Commonwealth, or from a nurse, health aide, or nurse's aide, who has personally examined the person sought to be committed, indicating to the satisfaction of the court that the public welfare or the interest of the person demands the commitment; provided, that the court shall, whenever practicable, endeavor to secure the testimony of a doctor or medical practitioner.

(b) A commitment for observation may be to any person or institution willing to accept the patient, and may only authorize the patient's detention for a period for not more than 30 days if the services of a doctor or medical practitioner are reasonably available. If such services are not reasonably available, commitment for observation may authorize the patient's detention until the patient may be brought to a doctor or medical practitioner or until a doctor or medical practitioner visits the community in which the patient is detained, and for not more than 30 days thereafter. Notice of each such commitment for observation shall be sent by the court making the commitment to the Director of Public Health and Environmental Services by the quickest means practicable.

61

At the time, Seman was being held in the CHC psychiatric unit pursuant to the 24-Hour Evaluation and Treatment Act, 3 CMC § 2521-2539, which permits a mental health professional designated by the Director of the Department of Public Health and Environmental Services to take mentally ill persons into custody for up to 24 hours for evaluation and treatment.[2] Seman was taken into custody for exhibiting what appeared to be depressive and uncooperative behavior on September 20, 1990.

The trial court held a hearing on the government's petition the day it was filed. Two of Seman's relatives and a CHC doctor testified.

According to one of Seman's sisters, Ester Chong, Seman chased another sister out of her house in San Jose, Saipan, shouting and pulling the sister's hair. Chong, who witnessed the incident, requested assistance from the police and a brother, Jose Seman ("Jose"), to restrain Seman.

After arriving on the scene, Jose and a police officer entered Seman's house and found her on her bed. Seman told her brother to leave. When Jose asked her to come with him to the CHC psychiatric unit,[3] she resisted, screaming and striking him in the hand. Jose and the police officer thereupon pulled Seman from her bed and took

_____

[2]For purposes of the 24-Hour Evaluation and Treatment Act, a "mentally ill" person is "a person with a mental disorder, who is an imminent danger to others or self and that is in need of immediate medical supervision, treatment, care, or restraint." 3 CMC § 2523(i).

[3]Jose Seman had taken Seman to the hospital for treatment on prior occasions.

her to CHC for treatment.

Dr. Robert Todd, a psychiatrist on the CHC staff, testified that Seman has a history of hospitalization and medication for "a condition which has been alternately diagnosed as manic depressive with psychotic features or schizo-affective disorder with manic depressive features." Transcript of Proceedings at 13. Dr. Todd expressed the opinion that Seman was "a danger to herself and others", id. at 15, and "should be in the hospital for a few days, maybe a couple of weeks or so, up to 30 days, anyhow, hopefully not as long as that to get her re-establish[ed] on the medication." Id. at 17.

After hearing the foregoing testimony, the trial court ruled that "the public welfare as well as the interests of . . . Catalina Seman" warranted Seman's commitment "to the care, custody and control of the Mental Health Division of the Commonwealth Health Center for a period not exceeding 30 days for observation, treatment, and medication as the medical personnel deem[] necessary." In Re Seman, Civil Action No. 90-846, Order for Temporary Commitment (NMI Super. Ct. Sept. 21, 1990).

Seman remained in the CHC psychiatric unit until her release within the period specified in the order.

She now appeals her commitment.

## II.

Seman claims that § 2513 is facially invalid because it violates substantive due process standards mandated by the U.S. and

NMI Constitutions.[4]

In order to reach the merits of this claim, we need to consider two preliminary issues. First, whether Seman's appeal is barred by mootness. Second, since Seman did not raise the due process claim below, whether she is barred from raising it on appeal.

## Mootness

The Superior Court order has lapsed and Seman has been released from the CHC psychiatric unit. It thus appears that we cannot afford her relief.

'As a general rule, in order to decide a case a court must be able to afford a petitioner the relief he or she seeks." <u>Govendo v. Micronesian Garment Mfg., Inc.</u>, No. 90-013, slip op. at 10 (N.M.I. Sept. 10, 1991). Our duty is to decide actual controversies by a judgment which can be carried into effect, and not to give opinions on moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter at issue in the case at bar. <u>Id</u>. This principle would ordinarily prevent us from considering Seman's claim.

However, when the issue raised affects the public interest, and it is likely that similar issues arising in the future would

---

[4]Seman also claims that 3 CMC § 2513 violates procedural due process guarantees and is unconstitutional as applied. Finally, she contends that the Superior Court's findings are not supported by substantial evidence. Because our decision concerning Seman's substantive due process claim is dispositive of this appeal, we need not address the other claims.

likewise become moot before a determination by an appellate court, an exception to the rule precluding consideration of moot claims is justified. Id.

The exception applies in this case. As in Govendo, the issues raised in this case are of public concern, and, if they were to recur, would likely become moot before they could be determined on appeal.

Seman's appeal is not barred by mootness.

### Failure to Raise Claim Below

Another problem is presented by the fact that Seman failed to raise her constitutional claim below.

Generally, an appellate court may not consider arguments raised for the first time on appeal. Ada v. Sablan, No. 90-006 (N.M.I. Nov. 16, 1990).[5] There are three narrow exceptions to this rule: (1) a new theory or issue arises because of a change in the law while the appeal was pending; (2) the issue is only one of law not relying on any factual record; or (3) plain error occurred and an injustice might otherwise result if the appellate court does not consider the issue. Id.

Seman contends that because the Superior Court upheld the constitutionality of § 2513 in a prior reported decision, In re Duncan, 3 CMC 383 (C.T.C. 1988) (examined in part III, infra), there was "little reason" to require her to raise the matter below.

---

[5]See also Camacho v. Northern Marianas Retirement Fund, No. 90-007 (N.M.I. Sept. 21, 1990).

Appellant's brief at 7. "The rationale of allowing the trial judge to consider the issue in the first instance has been accomplished." Id.

We have difficulty accepting this proposition.

While it is true that Duncan was issued by the same judge who sat in this case, we cannot foreclose the possibility that he would have ruled differently had he been given the opportunity to reconsider the constitutionality of § 2513. It should not be assumed that such an exercise would be futile.

However, we conclude that the second exception set forth in Ada is applicable in this case (i.e., the issue is only one of law not relying on any factual record). Therefore, we will consider Seman's constitutional claim. CNMI v. Bergonia, No. 91-001 (N.M.I. March 3, 1992) (court would consider constitutional claim not raised below where the issue was purely legal).[6]

III.

We now consider Seman's contention that § 2513 fails to satisfy substantive due process standards.

A. Substantive Due Process

Article I, § 5 of the NMI Constitution provides: "[n]o person shall be deprived of life, liberty or property without due process

_____

[6] Cf. State v. O'Neill, 545 P.2d 97 (Ore. 1976) (constitutional challenge to involuntary commitment statute raised for first time on appeal would be considered where trial court record was complete and sufficient to support constitutional ruling).

66

of law." Like the due process provisions of the Fifth and Fourteenth Amendments to the U.S. Constitution, this provision contains both procedural and substantive components. See Moreno v. State Department of Taxation, 775 P.2d 497 (Wyo. 1989) (analysis of due process provisions in U.S. and Wyoming Constitutions).

 "A statute violates substantive due process when a litigant with standing shows that a challenged statute adversely affects a recognized life, liberty, or property entitlement and in doing so does not promote a legitimate state objective by reasonable means." Id., 775 P.2d at 501. "A due process infringement of an individual's nonfundamental life, liberty, or property entitlement occurs only when it amounts to an arbitrary deprivation of that entitlement." Id., 775 P.2d at 500 (emphasis added). But when the individual interest restricted by statute is a fundamental right, the appropriate test, in determining the constitutionality of the statute, is the compelling state interest test--i.e., is there a compelling need or justification for the state action, by statute or otherwise, to override the personal right asserted. Fain v. Hall, 463 F.Supp. 661 (D. Fla. 1979); see also Payne v. Superior Court of Los Angeles County, 553 P.2d 565, 570 (Cal. 1976).

1. **Does involuntary commitment affect liberty -- a fundamental right?**

 Under NMI Const. Art. I, § 5, the right of personal liberty-- "the right to live in freedom from unwarranted interference by the State," People v. Reliford, 382 N.E.2d 72, 76 (Ill. App. 1978)--is a fundamental right. See People ex rel. Wayburn v. Schupf, 350

67

N.E.2d 906, 908 (N.Y. 1976) ("right to liberty [is] a fundamental right that is recognized in the constitutional sense as carrying a preferred status and so is entitled to special protection"); Molar v. Gates, 159 Cal.Rptr. 239 (Cal. Ct. App. 1979) (right to liberty a fundamental interest under California Constitution).

Without doubt, involuntary commitment is a "massive curtailment of liberty." Humphrey v. Cady, 405 U.S. 504, 509, 92 S.Ct. 1048, 1052, 31 L.Ed.2d 394 (1972). It curtails a fundamental personal right.

## 2. What constitutes compelling state interest?

Because the right to personal liberty is fundamental under NMI Const. Art. I, § 5, involuntary civil commitment can be justified only by a compelling government interest. See Colyar v. Third Judicial District Court for Salt Lake County, 469 F.Supp. 424 (D. Utah 1979) (applying Fourteenth Amendment to U.S. Constitution).

Under this test, three elements must be satisfied before a person may be involuntarily committed: (1) the person must be mentally ill; (2) pose a serious threat of substantial harm to him or herself or to others; and (3) this threat of harm must have been evidenced by a recent overt act or threat. The threat of harm to oneself may be through neglect or inability to care for oneself. Doremus v. Farrell, 407 F.Supp. 509 (D.Neb. 1975); see also Stamus v. Leonhardt, 414 F.Supp. 439 (S.D. Iowa 1976); Bell v. Wayne County General Hospital at Eloise, 384 F.Supp. 1085 (E.D. Mich. 1974).

## i. Mental illness

Section 2513 provides, in pertinent part, that the trial court may commit "for observation of _possible_ mental illness any person within its jurisdiction" based on testimony of a health care practitioner "who has personally examined the person sought to be committed, indicating to the satisfaction of the court <u>that the public welfare or the interest of the person demands the commitment</u> . . . ." (Emphasis added.) The emphasized language is the only specified criteria for determining the propriety of commitment.

We note that this statute was originally enacted by the Congress of Micronesia in 1966 and incorporated into the NMI Code in 1978.[7] It has not been altered since its original enactment. Constitutional limitations upon involuntary commitment have changed markedly in the quarter-century since the enactment of the statute. Under evolving case law, courts have recognized (1) the difficulty of defining 'mental illness,' (2) the need to commit persons to institutions against their will, and (3) the importance of the right of personal liberty.

> At one time or another every person exhibits some abnormal behavior which might be perceived by some as symptomatic of a mental or emotional disorder, but which is in fact within the range of conduct that is generally acceptable. Obviously, such behavior is no basis for compelled treatment and surely none for confinement.

---

[7]NMI Const. Schedule on Transitional Matters § 2, provides: "[l]aws in force in the Northern Mariana Islands on the day preceding the effective date of the Constitution that are consistent with the Constitution and the Covenant shall continue in force until they expire or are amended or repealed." CMC at B-343.

However, there is the possible risk that a fact-finder might decide to commit an individual based solely on a few isolated instances of unusual conduct. <u>Loss of liberty calls for a showing that the individual suffers from something more serious than is demonstrated by idiosyncratic behavior.</u>

<u>Addington</u>, 441 U.S. at 426-427, 99 S.Ct. at 1810 (emphasis added).

"[W]here commitment is possible <u>solely</u> on a finding of mental illness (with some rather general references to the interests of the subject) the substantive threshold for allowing commitment . . . is simply too low." <u>Stamus</u>, 414 F.Supp. at 451. Section 2513 does not even rise to this level. It impermissibly authorizes involuntary commitment for observation of <u>possible</u> mental illness.

### ii. Threat of harm.

Even if it is established that a person is mentally ill, it is impermissible to involuntarily commit him or her merely because "the public welfare or the interest of the person demands the commitment." Mentally ill persons may not be involuntarily committed unless they are dangerous to other persons or themselves. <u>O'Connor v. Donaldson</u>, 422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975).

To argue that it would be "in the interest of" a mentally ill person to be temporarily committed for hospitalization is not enough. It is unconstitutional to confine a nondangerous individual "who is capable of surviving safely in freedom by himself or with the help of willing and responsible family members or friends." <u>Id.</u>, 422 U.S. at 577, 95 S.Ct. at 2494.

70

### iii. Evidence of recent overt act or threat

In _Humphrey_, the U.S. Supreme Court stated that the degree of dangerousness constitutionally required before one may be involuntarily deprived of his or her liberty must be "great enough to justify such a massive curtailment of liberty." 405 U.S. at 509, 92 S.Ct. at 1052. This language "implies a balancing test in which the state must prove that there is an extreme likelihood that if the person is not confined he will do immediate harm to himself or others." _Lessard v. Schmidt_, 349 F.Supp. 1078, 1093 (E.D. Wis. 1972) (three-judge court), _vacated on other grounds_, 414 U.S. 473, 94 S.Ct. 713, 38 L.Ed.2d 661 (1974), _reinstated and enforced_, 379 F.Supp. 1376, _vacated on other grounds_, 421 U.S. 957, 95 S.Ct. 1943, 44 L.Ed.2d 445 (1975), _reinstated_ 413 F.Supp. 1318. "The proper standard is that which requires a finding of _imminent_ and _substantial_ danger as evidenced by a recent overt act, attempt or threat." _Suzuki v. Alba_, 438 F.Supp. 1106, 1110 (D.Haw. 1977), _modified_ _sub nom._ _Suzuki v. Yuen_, 617 F.2d. 173 (9th Cir. 1980). _See also_ _Lessard_, _supra_; _Doremus_, _supra_.

In interpreting our own Constitution, we adopt the above three factor tests.

### 3. Does § 2513 promote a legitimate state objective?

"The state has a legitimate interest under its _parens patriae_ powers in providing care to its citizens who are unable, because of emotional disorders, to care for themselves. The state also has authority under its police power to protect the community from the

71

dangerous tendencies of some who are mentally ill." _Addington v._ _Texas_, 441 U.S. 418, 425, 99 S.Ct. 1804, 1809, 60 L.Ed.2d 323 (1979).

## 4. Conclusion

 An involuntary commitment deprives a person of his or her personal right to liberty. The right to liberty is a fundamental right which requires a compelling state interest before the government may override it. For the government to establish a compelling state interest to involuntarily commit, it must show that the person is mentally ill and poses a serious threat of substantial harm to herself or others, as evidenced by recent overt act.

Section 2513, as it now stands, would permit the involuntary commitment of _any_ person "for observation of _possible_ mental illness." (_Emphasis supplied_.) Under this statute, the only requirement for commitment is that "the public welfare or the interest of the person demands the commitment." The statute does not satisfy the three-factor test noted above. Its scope is overbroad so as to encompass persons who are not mentally ill. Further, it is not drawn narrowly enough so that only those mentally ill persons who pose serious threat of substantial harm to themselves or to others, as evidenced by recent overt acts, may be committed. As such, the statute, on its face, violates the due process provision of the NMI Constitution and is hereby declared void.

IV.

## The Limits of Statutory Construction

As noted above, in In re Duncan the trial court upheld the constitutionality of § 2513.[8] To do so, it applied a limiting construction incorporating procedural and substantive due process safeguards mandated by the Fourteenth Amendment to the U.S. Constitution.

We reject the trial court's construction in In re Duncan as exceeding its judicial function.

It is appropriate, in this context, to analyze the limits of statutory construction.

In testing the constitutionality of a statute, the language must receive a construction that will conform it to a constitutional limitation, if it is susceptible of such an interpretation. See, e.g., United States Civil Service Commission v. National Association of Letter Carriers, AFL-CIO, 413 U.S. 548, 572, 93 S.Ct. 2880, 2893, 37 L.Ed.2d 796 (1973) ("our task is not to destroy the Act if we can, but to construe it, if consistent with the will of Congress, so as to comport with Constitutional limitations"). This principle comports with the strong, widely recognized judicial policy in favor of preserving statutes in the face of constitutional challenges whenever possible. See, e.g., Massachusetts Public Interest Research Group v. Secretary of Commonwealth, 375 N.E.2d 1175 (Mass. 1978).

---

[8]The trial court in Duncan sustained the validity not only of 3 CMC § 2513, but also statutes authorizing permanent commitment of mentally ill persons (3 CMC §§ 2511, 2512, 2514-2516).

However, there are limits to this approach.

"Although the courts should try, whenever possible, to construe statutes to avoid a constitutional infirmity, they may not, in doing so, rewrite the statute or do violence to its plain language." Long Island Vietnam Moratorium Committee v. Cahn, 437 F.2d 344, 348 (2nd Cir. 1970), affirmed 418 U.S. 906, 94 S.Ct. 3197, 41 L.Ed.2d 1153 (1974). It is improper for a court to insert numerous qualifying provisions in a statute to sustain its constitutional validity. This is a legislative function--not a judicial function. First National Bank of Arizona v. Superior Court of Maricopa County, 541 P.2d 392 (Ariz. 1975); Blair v. Pitchess, 486 P.2d 1242 (Cal. 1971).

In applying a limiting construction to § 2513, the trial court in Duncan overstepped the bounds of permissible statutory construction. It impermissibly inserted several qualifying provisions into the statute to align it with constitutional standards. This it could not do. First National Bank of Arizona, supra, Blair, supra.

We appreciate the trial court's concern in Duncan because of the practical effect of invalidating § 2513:

> To accept [amicus curiae's] proposition [that the statute is unconstitutional] is to throw the baby out with the bath water. If the statute is stricken and a mentally ill murderer is captured, the logical extension of [amicus curiae's] argument is that he must be released pending the enactment of legislation. Such a result is neither reasonable nor required.

> All parties concerned in this matter and the court are interested in one thing--providing for a constitutionally sound involuntary commitment procedure for

74

mentally ill persons. By utilizing the processes used by the court, this has been accomplished without creating the crisis [amicus curiae] advocates and without, of course, barring the legislature to construct a new statute after due deliberation and input from all knowledgeable sources.

3 CR at 398. Because of the practical consequences, it improperly upheld a statute that is fatally flawed.[9] The judiciary may not "rewrite" § 2513 to make it conform to constitutional guarantees. Only the legislature may do so.[10]

The Superior Court order is **REVERSED and VACATED**.

Entered this ___3rd___ day of April, 1992.

_____
JOSE S. DELA CRUZ, Chief Justice

_____
RAMON G. VILLAGOMEZ, Associate Justice

---

[9]Cf. Lessard, supra (striking down Wisconsin involuntary commitment statute); Doremus, supra (striking down Nebraska involuntary commitment statute); Suzuki, supra (striking down Hawaii involuntary commitment statute); Colyar, supra (striking down Utah involuntary commitment statute).

[10]We urge the legislature to enact legislation relating to commitment of mentally ill persons within constitutional limitations noted herein.

75

BORJA, Justice (Concurring):

I concur with the judgment of the majority. I, also, concur in the analysis of the issues, except the issue of whether there is a compelling government interest.

It is my opinion that the statute in question violates our due process provision because the criteria used to involuntarily commit an individual temporarily is unconstitutionally vague and overly broad. I would adopt the test noted in Stamus v. Leonhardt, 414 F.Supp. 439, 451 (S.D. Iowa 1976) for invalidating a statute because it is vague and overly broad. That test is:

> A statute may be invalidated as impermissibly vague as a result of one or both of the following deficiencies . . . (1) failure to give fair warning of the conduct proscribed by law, and (2) absence of standards restricting the discretion of governmental authorities or courts who apply the law.

(Citations omitted.) See Commonwealth v. Bergonia, No. 91-001 (N.M.I. Mar. 19, 1992); Commonwealth v. Kaipat, No. 90-059 (N.M.I. Oct. 21, 1991) (both cases state the first part of the test in criminal proceedings).

I do not think the statute violates due process of law because there is no compelling commonwealth interest. The Commonwealth has a legitimate and compelling interest in being able to determine if a person is mentally ill, in need of care and treatment. The majority acknowledges this at pages 12-13 of their opinion.

Due process of law requires that statutes that deprive individuals of their liberty be drawn as narrowly as possible. This is necessary to protect against any unnecessary deprivation of

76

liberty. The criteria used in 3 CMC § 2513 in permitting a temporary involuntary commitment is too broad and vague. Not enough guidance exists to properly guide the Commonwealth in a commitment proceeding. Some of the constitutionally defective language of the statute includes the following:

1. The statute allows any doctor or medical practitioner licensed to practice in the Commonwealth to testify in the commitment proceeding. The statute does not state that such doctor or medical practitioner must be one who is competent in diagnosing and treating mental illnesses. This gives too much discretion to the Commonwealth.

2. Allowing persons without proper qualifications, like a nurse, health aide, or nurse's aide, to testify in a commitment proceeding is not an adequate safeguard against an unnecessary deprivation of liberty. This gives too much discretion to the Commonwealth.

3. The words "public welfare ... demands the commitment" leave too much to the discretion of the judge to deprive an individual of his or her liberty.

4. The words "interest of the person demands the commitment" also leave too much to the discretion of the judge to deprive an individual of his or her liberty.

5. As a last example, the statute permits an extension of the temporary 30 day commitment without specific and narrowly drawn guidelines. There is too much discretion on the Commonwealth.

The legislature must enact a statute that is narrowly drawn to

77

adequately provide guidance to the Commonwealth in temporary involuntary commitment proceedings. I agree with the majority that, at a minimum, the statute must provide that the person to be involuntarily committed must be mentally ill and poses a serious threat of substantial harm to himself or herself, or to others. This test, however, is not to determine whether there is a compelling Commonwealth interest. This test is to be used as the criteria in promoting the Commonwealth's legitimate and compelling interest in the care and treatment of mentally ill persons.

Jesus C. Borja
Justice